IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

BARBARA MIHALICH, individually and on          )
behalf of all others similarly situated,                )
                                                                         )
      Plaintiff,                                                )          Case No.  3:14-cv-00600-MJR-SCW
                                                                         )
v.                                                                       )          JURY TRIAL DEMANDED
                                                                         )
JOHNSON & JOHNSON and JOHNSON          )
& JOHNSON CONSUMER COMPANIES, INC.,  )
                                                                         )
      Defendants.                                          )

## CLASS ACTION COMPLAINT

Plaintiff Barbara Mihalich brings this action on behalf of herself and all others similarly situated against Defendants Johnson & Johnson ("J&J") and Johnson & Johnson Consumer Companies, Inc. ("J&J Consumer") (together, "Defendants") and states:

## NATURE OF ACTION

1.    Defendants manufacture, distribute, and market Johnson's® Baby Powder ("Baby Powder").  Johnson's® Baby Powder is comprised entirely of talc with a small amount of fragrance.  Talc is a hydrous magnesium silicate, an inorganic material that is mined from the earth.

2.    Defendants market the Baby Powder as a means of eliminating friction on the skin and absorbing moisture, while keeping skin cool and comfortable.  Defendants market the Baby Powder for use on infants "after every bath and diaper change" and for women to "[u]se anytime you want skin to feel soft, fresh and comfortable."

3.    Consumers expect talc to be safe to use.  In fact, the only warnings Defendants provide to consumers about the dangers of the Baby Powder is to keep the powder away from

eyes, avoid inhalation of the powder, and use the powder externally.  Defendants do not provide any other warnings about the Baby Powder.

4.      Johnson's® Baby Powder is not safe.  As numerous studies have confirmed, Johnson's® Baby Powder leads to a significant increased risk of ovarian cancer.  Women who used talc-based powders to powder their genital area have a 33% increased risk of ovarian cancer compared to those women who never used the powders.

5.      Despite the potential catastrophic health consequences, Defendants do not tell consumers about the dangers associated with the talc-based Johnson's® Baby Powder.  Instead, Defendants continue to expressly and impliedly represent that the product is safe and intended for women to use the Baby Powder in the very manner most likely to result in an increased risk of ovarian cancer.

6.      As recently as May 12, 2014, Defendants issued the following statement: "We have no higher responsibility than the health and safety of consumers who rely on our products. It is important for consumers to know that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies."

7.      As a result of Defendants' misrepresentations and omissions regarding the safety of Johnson's® Baby Powder, Plaintiff and the proposed Class have purchased a product which is potentially lethal.

8.      Plaintiff brings this action on behalf of herself and other similarly situated Illinois consumers who have purchased Johnson's® Baby Powder in Illinois seeking injunctive relief under the Illinois Consumer Fraud and Deceptive Business Practices Act,  for violations of the Missouri Merchandising Practices Act, 815 ILCS 505/1, *et seq.*  Plaintiff seeks injunctive relief to stop Defendants' deceptive and fraudulent commercial practices in order to protect Illinois

consumers. Plaintiff is not claiming physical harm or seeking the recovery of personal injury or other monetary damages.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and the members of the Class are citizens of a state different from Defendants.

10.     This Court has personal jurisdiction over Defendants because Defendants are authorized to conduct and do conduct business in Illinois. Defendants have marketed, promoted, distributed, and sold Johnson's® Baby Powder in Illinois and Defendants have sufficient minimum contacts with this State and/or sufficiently avail themselves of the markets in this State through their promotion, sales, distribution and marketing within this State to render the exercise of jurisdiction by this Court permissible.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred while she resided in this judicial district. Venue is also proper under 18 U.S.C. §1965(a) because Defendants transact substantial business in this District.

## PARTIES

12.     Plaintiff resides in Madison County, Illinois. During the past few years, including in 2014, Plaintiff has purchased for personal use Johnson's® Baby Powder, which costs approximately $3.50.

13.     Defendant Johnson & Johnson ("J&J") is a New Jersey corporation with its principle place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey

08933.  J&J is in the business of manufacturing and selling consumer products.  J&J marketed, distributed, and sold Johnson's® Baby Powder products to hundreds of thousands of consumers in Illinois.

14.    Defendant Johnson & Johnson Consumer Companies, Inc. is incorporated under the laws of the state of New Jersey.  Defendant's corporate headquarters is located at 199 Grandview Road Skillman, New Jersey 08558.  Johnson & Johnson Consumer Companies, Inc. operates as a subsidiary to Johnson & Johnson. Defendant researches, develops, manufactures, distributes, markets, and sells consumer products targeted at babies and mothers, including Johnson's® Baby Powder.  Defendant marketed, distributed, and sold Johnson's® Baby Powder products to hundreds of thousands of consumers in Illinois.

## FACTUAL ALLEGATIONS

### Johnson's® Baby Powder Advertisements Emphasize Its Use for Women and Babies

15.    In 1893, Defendants developed Johnson's® Baby Powder.  For decades Defendants have manufactured, distributed, marketed and sold Johnson's® Baby Powder as a daily use powder intended to eliminate friction on the skin and to absorb unwanted excess moisture for both babies and women.

16.    Defendants have consistently marketed Johnson's® Baby Powder for use on women to maintain freshness and cleanliness.  Historically, the Baby Powder label and advertising encouraged women to dust themselves with the Baby Powder daily to mask odors.

17.    Although the label has changed over time, the message is the same: that the product is safe for use on women as well as babies.  The Baby Powder label currently states that "Johnson's® Baby Powder is designed to gently absorb excess moisture helping skin feel comfortable.  Our incredibly soft, hypoallergenic, dermatologist and allergy-tested formula

4

glides over skin to leave it feeling delicately soft and dry while providing soothing relief."
Defendants instruct consumers on the product labeling to "Shake powder directly into your hand, away from the face, before smoothing onto the skin."

18.     Representative product packaging and labeling for Johnson's® Baby Powder appears as follows:





19.     Through other marketing, including on their website for Johnson's® Baby Powder, Defendants similarly encouraged women to use the product daily.  Defendants state that Johnson's® Baby Powder "keeps skin feeling soft, fresh and comfortable.  It's a classic.  Johnson's® Baby Powder helps eliminate friction while keeping skin cool and comfortable.  It's made of millions of tiny slippery plates that glide over each other to help reduce the irritation caused by friction."  Under a heading "How to Use," "For skin that feels soft, fresh and

comfortable, apply Johnson's® Baby Powder close to the body, away from the face.  Shake powder into your hand and smooth onto skin."  Under a heading "When to Use," Defendants recommend that consumer "Use anytime you want skin to feel soft, fresh and comfortable.  For baby, use after every bath and diaper change."

**Defendants Represent Johnson's® Baby Powder as a Safe and Trusted Product**

20.     Defendants seek to convey an image as a safe and trusted family brand.  For example, on their website for Johnson's® Baby Powder, Defendants state the product is "Clinically proven to be safe, gentle and mild."

21.     Defendants also have a website, www.safetyandcarecommitment.com, devoted to "Our Safety & Care Commitment."  According to Defendants, "safety is our legacy" and "[y]ou have our commitment that every beauty and baby care product from the Johnson & Johnson Family of Consumer Companies is safe and effective when used as directed."  Defendants market a "Five-Level Safety Assurance Process," which they describe as follows: "for decades, ours has been one of the most thorough and rigorous product testing processes in our industry – to ensure safety and quality of every single product we make."  Defendants' so-called "Promise to Parents and their Babies" includes that "[w]hen you bring our baby care products into your home, you can be assured of our commitment to the safety of your family and families around the world."  Nowhere do Defendants warn of the increased risk of ovarian cancer linked to the use of Johnson's® Baby Powder.

22.     On May 12, 2014, Defendants issued the following statement: "We have no higher responsibility than the health and safety of consumers who rely on our products.  It is important for consumers to know that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies."  *See* Fox 32 Chicago, *Popular Baby*

*Powder Allegedly Caused Cancer In Pro-Figure Skater* (May 12, 2014), *available at*:

http://www.myfoxchicago.com/story/25497847/popular-baby-powder-allegedly-caused-cancer-in-pro-figure-skater.

**Defendants Knew of the Increased Risk of Ovarian Cancer
From Use of Johnson's® Baby Powder**

23.     Johnson's® Baby Powder is made entirely of talc and fragrance.  Talc is a mineral composed of hydrated magnesium silicate that is mined from the earth.  It is an inorganic material.  Talc is used in to manufacture goods, such as paper making, plastic, paint and coatings, rubber, food, electric cable, ceramics, and cosmetics.  In its loose form and as used in the Baby Powder, talc is known as "talcum powder."

24.     As detailed below, beginning in at least 1982, Defendants were aware of several studies that demonstrated that women who used talc-based baby powder in the genital area had a significant increased risk of ovarian cancer.  Since 1982, there have been 21 studies by doctors and scientists throughout the world (including 19 case-control studies, 1 cohort study, and 1 combined case-control and cohort study) that reported an elevated risk for ovarian cancer with genital talc use.  The majority of these studies show a statistically significant increased risk of ovarian cancer.

25.     However, Defendants do not warn or inform consumers anywhere, including on the product labeling or in its marketing or advertising for the product, that use of Johnson's® Baby Powder may be harmful to health, including significantly increasing the risk of ovarian cancer.

**A.     The Overwhelming Scientific and Medical Evidence**

26.     Research conducted as early as 1961 showed that particles similar to talc can translocate from the exterior genital area to the ovaries of women.  *See* Egi, G.E. and Newton,

M., *The transport of carbon particles in the human female reproductive tract*, 12 Fertil. Steril. 151-155 (1961).

27.    Because of the potential for transmission, researchers remained concerned about the carcinogenic nature of talc and the effects of talc use.  A 1968 study concluded that "[a]ll of the 22 talcum products analyzed have a . . . fiber content . . . averaging 19%.  The fibrous material was predominantly talc but contained minor amounts of tremolite, anthophyllite, and chrysotile [asbestos-like fibers] as these are often present in fibrous talc mineral deposits . . . . Unknown significant amounts of such materials in products that may be used without precautions may create an unsuspected problem."  Cralley LJ, et al., *Fibrous and mineral content of cosmetic talcum products*, 29 Am. Ind. Hyg. Assoc. J. 350-354 (1968).  In a 1976 follow up study, researchers concluded that "[t]he presence in these products of asbestiform anthophyllite and tremolite, chrysotile, and quartz indicates the need for a regulatory standard for cosmetic talc. . . . We also recommend that evaluation be made to determine the possible health hazards associated with the use of these products."  Rohl AN, et al, *Consumer talcums and powders: mineral and chemical characterization*, 2 J. Toxicol. Environ. Health 255-284 (1976).

28.    The first study to suggest a link between ovarian cancer and talc powder use was conducted in 1971.  In that study, researchers found talc particles "deeply embedded" in 10 of 13 ovarian tumors, 12 of 21 cervical tumors, one primary carcinoma of the endometrium, and 5 of 12 "normal" ovaries from women with breast cancer.  Henderson, W.J., et al., *Talc and carcinoma of the ovary and cervix*, 78 (3) J. Obstet. Gynaecol. Br. Commonw. 266-272 (1971).

29.    The scientific evidence linking talc use and ovarian cancer continued to build.  In 1982, Daniel Cramer of the Departments of Obstetrics, Gynecology, and Pathology, Boston Hospital for Women, Division of the Brigham and Women's Hospital, the Department of

Epidemiology, Harvard School of Public Health and the Department of Pathology, Massachusetts General Hospital, Harvard Medical School, conducted a case-control study which found that talc applied directly to the genital area around the time of ovulation leads to talc particles becoming deeply imbedded in the substance of the ovary causing foreign body reaction and growth of epithelial ovarian tissue. The study found a statistically significant 92% increased risk of ovarian cancer from genital talc use. This study proved an epidemiologic association between the use of cosmetic talc in genital hygiene and ovarian cancer. This study was funded by a grant from National Institutes of Health (NIH). Cramer, D.W., et al., *Ovarian cancer and talc: a case control study*, 50 Cancer 372-376 (1982). Soon after this study was published, Dr. Cramer was contacted and visited by Dr. Bruce Semple from J&J whereby Dr. Cramer advised Dr. Semple to place a warning on his company's talcbased body powders regarding the increased risk of ovarian cancer.

30. Since 1982, there have been 21 additional studies by different doctors and scientists throughout the world including 19 case-control studies, 1 cohort study, and 1 combined case-control and cohort study, which have provided epidemiologic data addressing the talc and ovarian cancer association. Nearly all of these studies have reported an elevated risk for ovarian cancer associated with perineum use of talcum powder and the majority of the studies show statistically significant elevations.

31. In 1983, Patricia Hartge and Robert Hoover of the National Cancer Institute and Linda Lester and Larry McGowan of the George Washington University Medical Center, performed a case-control study and found a 150% increased risk of ovarian cancer for women who use talcum powder in the genital area. Hartge, P. et al., *Talc and ovarian cancer*, JAMA 1983, 1844.

32.     Similarly, in 1988, a case control study of 188 women diagnosed with epithelial ovarian cancer and 539 control women found that 52% of the cancer patients habitually used talcum powder on the perineum before their cancer diagnosis.  The study showed a 40% increase in risk of ovarian cancer in women that used talcum powder on their perineum and a positive dose-response relationship.  *See* Whittemore, A.S., et al., *Personal and environmental characteristics related to epithelial ovarian cancer. II. Exposures to talcum powder, tobacco, alcohol, and coffee*, Am. J. Epidemiol. 1228-1240 (1988).

33.     Another case control study conducted in 1989 found similar results.  The study looked at 235 women diagnosed with epithelial ovarian cancer and 451 controls and found a 29% increased risk in ovarian cancer with women who reported genital talcum powder use more than once per week.  *See* Booth, M. et al., *Risk factors for ovarian cancer: a case-control study*, Br. J. Cancer, 592-598 (1989).

34.     A case control study conducted in 1989 by Bernard Harlow, et al., of Harvard Medical School at Brigham and Women's Hospital, found an increased risk of ovarian cancer generally from genital talc use after bathing and found a statistically significant 180% increased risk of ovarian cancer from women that used talc-containing powders in combination with deodorizing powders on their perineum.  This study also found positive dose-response relationship.  Harlow, B.L. & Weiss, N.S., *A case-control study of borderline ovarian tumors: the influence of perineal exposure to talc*, Am. J. Epidemiol., 390-394 (1989).

35.     In 1992, a case-control study was conducted by Karin Rosenblatt, et al., from the Department of Epidemiology, The Johns Hopkins School of Hygiene and Public Health and Department of Gynecology and Obstetrics.  This study that found a 70% increased risk in women from genital talc use and found a 379% increased risk of ovarian cancer of women who used talc

on sanitary napkins in their genital area.  Rosenblatt, K.A. et al., *Mineral fiber exposure and the development of ovarian cancer*, 45 (1) Gynecol. Oncol. 20-25 (1992).

36.     Additionally, a 1992 case-control study conducted by Yong Chen, et al., of 112 diagnosed epithelial ovarian cancer cases and 224 age-matched community controls, found an elevated risk of 290% for ovarian cancer for women who applied talc-containing dusting powder to the lower abdomen and perineum for longer than 3 months.  Yong Chen et al., *Risk Factors for Epithelial Ovarian Cancer in Beijing, China*, Int. J. Epidemiol., 23-29 (1992).

37.     In 1993, the United States National Toxicology Program published a study on the toxicity of non-asbestiform talc and found clear evidence of carcinogenic activity.  The study found "some evidence of carcinogenic activity in male rats" and "clear evidence of carcinogenic activity in female rats."  Accordingly, talc was found to be a carcinogen, with or without the presence of asbestos-like fibers.  National Toxicology Program, *Toxicology and carcinogenesis studies of talc (CAS No 14807-96-6) in F344/N rats and B6C3F 1 mice (Inhalation studies)*, Technical Report Series No 421 (Sept. 1993).

38.     In 1995, a case control study was conducted in Australia by David Purdie, et al., involving over 1600 women.  This was the largest study of its kind to date.  This study found a statistically significant 27% increased risk in ovarian cancer for women who regularly use talc in the region of the abdomen or perineum.  Purdie, D., et al., *Reproductive and other factors and risk of epithelial ovarian cancer: an Australian case-control study. Survey of Women's Health Study Group*, 62 (6) Int. J. Cancer 678-684 (1995).

39.     In 1996, a case-control study similarly found a statistically significant 97% increased risk of ovarian cancer in women who used talc-based powders in their genital area.

*See* Shushan, A., et al, *Human menopausal gonadotropin and the risk of epithelial ovarian cancer*, 65 (1) Fertil. Steril. 13-18 (1995).

40.     In 1996, the condom industry stopped dusting condoms with talc due to the health concerns of ovarian cancer.  "Concern about talc as an ovarian carcinogen goes back 50 years in the medical literature.  By the 1970s, evidence was mounting that talc particles might migrate into a woman's fallopian tubes where they could cause scarring and irritation in the ovaries. Scientists believed in some cases that the scarring led to infertility or cancer."  McCullough, Marie, *Women's health concerns prompt condom makers to stop using talc*, Jersey Journal (City Edition) (April 17, 1996).

41.     In 1997, a case control study of 313 women with ovarian cancer and 422 without this disease found that the women with cancer were more likely to have applied talcum powder to their external genitalia area.  Women using these products had a statistically significant 50% to 90% higher risk of developing ovarian cancer.  *See* Cook, L.S., et al., *Perineal powder exposure and the risk of ovarian cancer*, Am. J Epidemiol. 145, 459-465 (1997).

42.     In 1997, a case-control study was conducted by Stella Chang and Harvey Risch from the Department of Epidemiology and Public Health, Yale University School of Medicine which included over 1,000 women.  The study found a statistically significant increased risk of 42% for ovarian cancer for women who applied talc via sanitary napkins to their perineum.  The study indicated that "Commercial talc substitutes often replace talc with cornstarch. Furthermore, women may choose to powder or dust with cornstarch instead of talc.  When cornstarch was assessed in relation to risk of ovarian carcinoma, no associations were found." The study concluded, "The results of this study appear to support the contention that talc exposure increases risk of ovarian carcinoma.  Dusting with talcum powder is not an unusual

practice for women, and, given the heterogeneity of the etiology and course of ovarian carcinoma, any possible harmful practices, particularly those with little benefit, should be deliberated." Chang, S. & Risch, H.A., *Perineal talc exposure and risk of ovarian carcinoma*, 79 (12) Cancer 2396-2401 (1997).

43. In a 1998 case-control study conducted in Canada by Beatrice Godard, et al., a 149% increased risk of ovarian cancer was found in women who used talc-based powders on their perineum. Godard, B., et al., *Risk factors for familial and sporadic ovarian cancer among French Canadians: a case-control study*, 179 (2) Am. J. Obstet. Gynecol. 403-410 (1998).

44. Daniel Cramer from the Obstetrics-Gynecology Epidemiology Center, Department of Obstetrics and Gynecology, Brigham and Women's Hospital conducted another case-control study in 1999 of 563 women newly diagnosed with epithelial ovarian cancer and 523 control women. The study found a statistically significant 60% increased risk of ovarian cancer in women that used talc-based body powders on their perineum. "We conclude that there is a significant association between the use of talc in genital hygiene and risk of epithelial ovarian cancer that, when viewed in perspective of published data on this association, warrants more formal public health warnings." The study was funded by a grant from the National Cancer Institute (NCI). Cramer, D.W., et al, *Genital talc exposure and risk of ovarian cancer*, 81 (3) Int. J. Cancer 351-356 (1999).

45. In 2000, Roberta Ness, et al., from University of Pennsylvania, produced a case-control study of over 2,000 women. This study found a statistically significant 50% increased risk of ovarian cancer from genital talc use in women. The study also found that talc causes inflammation and that inflammation contributes to cancer cell development. Ness, R.B., et al.,

*Factors related to inflammation of the ovarian epithelium and risk of ovarian cancer*, 11 (2) Epidemiology 111-117 (2000).

46.     Also in 2000, a prospective cohort study considered to be the most informative study to date, found a 40% increase in invasive serous cancers from women who applied talcum powder to their perineum.  Gertig, D.M., et al., *Prospective study of talc use and ovarian cancer*, 92 J. Natl. Cancer Inst. 249-252 (2000).

47.     In 2004, Paul Mills, Deborah Riordan, Rosemary Cress and Heather Young of Cancer Registry of Central California – Public Health Institute, Fresno, California; Fresno Medical Education Program, University of California, San Francisco, Fresno, California; California Cancer Registry, Sacramento, California; and the Department of Epidemiology and Biostatistics, George Washington University School of Public Health and Health Services, performed a case-control study of nearly 1400 women from 22 counties in Central California. This study found a statistically significant 37% increased risk of epithelial ovarian cancer from women's genital talc use.  The study also found a 77% increased risk of serous invasive ovarian cancer from women's genital talc use.  The study looked at women's use of cornstarch powders and found no increased risk in ovarian cancer in women who used these types of powders on the perineum as "Cornstarch is also not thought to exert the same toxicologic reaction in human tissue as does talc."  This study concluded by stating that "users should exercise prudence in reducing or eliminating use.  In this instance, the precautionary principle should be invoked, especially given that this is a serious form of cancer, usually associated with a poor prognosis, with no current effective screening tool, steady incidence rates during the last quarter century and no prospect for successful therapy.  Unlike other forms of environmental exposures, talcum

powder use is easily avoidable." Mills, P.K., et al., *Perineal talc exposure and epithelial ovarian cancer risk in the Central Valley of California*, 112 Int. J. Cancer 458-64 (2004).

48.     In 2007, Amber Buz'Zard and Benjamin Lau performed a study whereby they induced carcinogenesis by applying talc to normal human epithelial and granulosa ovarian cancer cell lines. Buz'Zard A.R., et al., *Pycnogenol reduces talc-induced neoplastic transformation in human ovarian cell cultures*, 21 (6) Phytother. Res. 579-586 (2007).

49.     In 2008, Margaret Gates, of Channing Laboratory, Department of Medicine, Brigham and Women's Hospital and Harvard Medical School; Departments of Epidemiology and Biostatistics, Harvard School of Public Health; Obstetrics and Gynecology Epidemiology Center, Brigham and Women's Hospital, and Norris Cotton Cancer Center, Dartmouth-Hitchcock Medical Center, performed a combined study of over 3,000 women from a New England-based case-control study and a prospective Nurses' Health Study with additional cases and years of follow up from these studies (the "Gates Study"). This study was funded by the National Cancer Institute (NCI), and found a general 36% statistically significant increased risk of epithelial ovarian cancer from genital talc use. A 60% increased risk of the serous invasive subtype was also found.

50.     Dr. Gates found a strong and positive dose-response relationship whereby increased risk was seen with higher talc usage in women. Dr. Gates commented about this study saying these latest results "provide additional support for a main effect of genital talc exposure on epithelial ovarian cancer." She also stated that "the finding of highly significant trends between increasing frequency of use and risk 'strengthens the evidence of an association, because most previous studies have not observed a dose response.'" It was concluded that, "We believe that women should be advised not to use talcum powder in the genital area, based on our

results and previous evidence supporting an association between genital talc use and ovarian

cancer risk.  Physicians should ask the patient about talc use history and should advise the patient

to discontinue using talc in the genital area if the patient has not already stopped."  Dr. Gates

further stated that "An alternative to talc is cornstarch powder, which has not been shown to

increase ovarian cancer risk, or to forgo genital powder use altogether."  Gates, M.A., et al., *Talc*

*Use, Variants of the GSTM1, GSTT1, and NAT2 Genes, and Risk of Epithelial Ovarian Cancer*,

17 (9) Cancer Epidemiology, Biomarkers & Prev. 2436-2444 (2008).

51.     In May 2008, the CPC, joined by its chairman and numerous other physicians and

chairs of public health and medical associations, submitted a citizen's petition "seeking a cancer

warning on cosmetic talc products."[1] **The petition sought to require all cosmetic talc products**

**to bear labels with warnings** such as, "Frequent application of talcum powder in the female

genital area substantially increases the risk of ovarian cancer" or "Frequent talc application in the

female genital area *is responsible* for major risks of ovarian cancer."  (emphasis added).  The

petition cited numerous studies and publications and sought a hearing to present scientific

evidence.

52.     In October of 2008, Michael Thun, Vice-President of Epidemiology and

Surveillance Research at the American Cancer Society commented on the Gates Study.  He

stated the dose-response relationship between talc and ovarian cancer had finally been satisfied

---

[1] The petition was submitted on behalf of: Samuel S. Epstein, M.D., Chairman, CPC, and Professor emeritus Occupational and Environmental Medicine, University of Illinois at Chicago School of Public Health; Peter Orris, M.D., Professor and Chief of Service, University of Illinois at Chicago Medical Center; Quentin Young, M.D., Chairman, Health and Medicine Policy Research Group, Chicago; Rosalie Bertell, Ph.D., International Association for Humanitarian Medicine, Scientific Advisor to the International Institute of Concern for Public Health, Toronto, and the International Science Oversight Board of the Organic Consumers Association, Washington, D.C.; and Ronnie Cummins, National Director of the Organic Consumers Association.

by this study. Dr. Thun said, "There are very few modifiable risk factors for ovarian cancer. The main one is the use of oral contraceptives, which has been clearly established to lower the risk for ovarian cancer. Others include tubal ligation, hysterectomy, and parity. Then there are factors that 'probably' increase the risk for ovarian cancer, and this is where talc fits in, alongside asbestos, postmenopausal hormone therapy, and radiation." Chustecka, Zosia & Lie, Desiree, *Talc Use in Genital Area Linked to Increased Risk for Ovarian Cancer*, Medscape Medical News (2008).

53.     In 2008, Melissa Merritt, from the Australian Cancer Study (Ovarian Cancer) and Australian Ovarian Cancer Study Group, conducted a case-control study of over 3,000 women where a statistically significant 17% increased risk of ovarian cancer for women who used talc on their perineum was confirmed. This study also confirmed a statistically significant 21% increased risk of ovarian cancer of a serous subtype in women who used talc on their perineum. Merritt, M.A., et al., *Talcum powder, chronic pelvic inflammation and NSAIDs in relation to risk of epithelial ovarian cancer*, 122 (1) Int. J. Cancer 170-176 (2008).

54.     In 2009, a case-control study of over 1,200 women found the risk of ovarian cancer increased significantly with increasing frequency and duration of talc use. The study found an overall statistically significant 53% increased risk of ovarian cancer from genital talc use. The study also found a 108% statistically significant increased risk of ovarian cancer in women with the longest duration and most frequent talc use. The study concluded by stating, "that risk of ovarian cancer is significantly associated with talc use and with a history of endometriosis, as has been found in recent studies." Wu, A.H., et al., *Markers of inflammation and risk of ovarian cancer in Los Angeles County*, 124 (6) Int. J. Cancer 1409-1415 (2009).

55.     In 2011, Daniel Cramer of Brigham and Women's Hospital, Harvard Medical School, made public another case-control study of over 4,000 women. This study, which was funded by the National Cancer Institute (NCI), found a 200% to 300% increased risk of ovarian cancer for women who applied talc-based body powders to their perineum. This study found a strong dose-response relationship and explained why the dose-response has been under reported in prior studies. In commenting on this study, Dr. Cramer stated "I have always advised gynecologists, if they examine a woman and see that she is using talc in the vaginal area, tell her to stop . . . There are alternatives. This study strongly reinforces that advice."

56.     In 2011, another case-control study of over 2,000 women found a 27% increased risk of ovarian cancer from genital talc use in women. Rosenblatt, K.A., et al., *Genital powder exposure and the risk of epithelial ovarian cancer*, 22 Cancer Causes Control 737-742 (2011).

57.     In June of 2013, Kathryn Terry, et al., published a pooled analysis of over 18,000 women in eight case-control studies and found a 20% to 30% increased risk of women developing epithelial ovarian cancer from genital powder use. The study concluded by stating, "Because there are few modifiable risk factors for ovarian cancer, avoidance of genital powders may be a possible strategy to reduce ovarian cancer incidence." Terry, K.L., et al., *Genital Powder Use and Risk of Ovarian Cancer: A Pooled Analysis of 8,525 Cases and 9,859 Controls*, 6 (8) Cancer Prevention Research, 81-82 (2013).

58.     In addition to the numerous case control studies over the last several decades, several meta-analyses were conducted on the topic of talcum powder use and ovarian cancer. A meta-analysis is a statistical technique that allows similar measures of the same illness and exposure from different studies to be combined to determine whether an association exists. All

analyses found a significant positive association between the use of talcum powder in the genital area and ovarian cancer.

59.	In 1992, the National Cancer Institute sponsored the first meta-analysis conducted by Bernard Harlow and Daniel Cramer from Harvard Medical School at Brigham and Women's Hospital. This was the most comprehensive study to date whereby 235 cases with ovarian cancer were compared to 239 controls. Through personal interviews with these women Harlow and Cramer found that nearly 17% of the control group reported frequent talc application to the perineum. The study found "the most frequent method of talc exposure was use as a dusting powder directly to the perineum (genitals) . . . . Brand or generic 'baby powder' was used most frequently and was the category associated with a statistically significant risk for ovarian cancer." The study concluded that "a lifetime pattern of talc use may increase the risk for epithelial ovarian cancer," and that "[g]iven the poor prognosis for ovarian cancer, any potentially harmful exposures should be avoided, particularly those with limited benefits. For this reason, we discourage the use of talc in genital hygiene, particularly as a daily habit." Harlow, B.L. et al., *Perineal exposure to talc and ovarian cancer risk*, Obstet. Gynecol. 1992, 19-26. The summary odds ratio (and 95% confidence interval) was 1.3 (1.1, 1.6) indicating a statistically significant 30% increased risk of ovarian cancer from genital talc use.

60.	In 1995, a second meta-analysis conducted by A. J. Gross and P. H. Berg included data from nine separate papers, which yielded a summary odds ratio (based upon the crude measures) of 1.27 (1.09, 1.48) – again a statistically significant 27% increased risk of ovarian cancer from genital talc use. *See* Gross, A.J. & Berg, P.H., *A meta-analytical approach examining the potential relationship between talc exposure and ovarian cancer*, 5 (2) J. Expo. Anal. Environ. Epidemiol. 181-195 (1995).

61.     David Cramer performed the third meta-analysis in 1999 supported by the National Cancer Institute.  It included all of the studies in the Gross and Berg meta-analysis plus four new studies as well as the odds ratio based upon a new series of 563 cases with ovarian cancer and 523 controls from Massachusetts and New Hampshire.  The summary odds estimate was 1.39 (1.24, 1.49), again a statistically significant 39% increased risk of ovarian cancer from genital talc use.

62.     In 2003, a fourth meta-analysis funded by the industry re-analyzed data from 16 studies published prior to 2003 and found a 33% increase in ovarian cancer risk among talc users.  *See* Huncharek, M., et al., *Perineal application of cosmetic talc and risk of invasive epithelial ovarian cancer: a meta-analysis of 11,933 subjects from sixteen observational studies*, 23 Anticancer Res. 1955-60 (2003).

**B.     All Leading Authorities Agree on the Link Between Ovarian Cancer and Perineal Use of Talc Powder**

63.     In 2005, the Fifth Edition of "Myths & Facts about ovarian cancer. What you need to know," was published by Steven Piver, M.D., and Gamal Eltabbakh, M.D.  This publication was partly sponsored by Glaxo Smith Kline.  Dr. Piver is the Chair Emeritus of the Department of Gynecologic Oncology, and Founder and Director of the Gilda Radner Familial Ovarian Cancer Registry at Roswell Park Cancer Institute, Buffalo, New York. Dr. Eltabbakh is a tenured Professor of Obstetrics and Gynecology and Medicine, and Director of the Division of Gynecologic Oncology at the University of Vermont in Burlington, Vermont.  In the section entitled "What Causes Ovarian Cancer?" it lists "Use of Talc (Baby Powder) in the Genital Area" as a risk factor for causing ovarian cancer and further states, "research has established that each has at least a small role" in causing cancer in women.

64.     In February of 2006, the International Association for the Research of Cancer (IARC), part of the World Health Organization, published a paper whereby they classified genital use of talc-based body powder as a "Group 2B" possible human carcinogen. IARC, which is universally accepted as the international authority on cancer issues, concluded that studies from around the world consistently found an increased risk in ovarian cancer in women from perineal use of talc. IARC found that between 16-52% of women in the world were using talc to dust their perineum and found an increased risk of ovarian cancer in women talc users ranging from 30-60%.

65.     IARC concluded with this "Evaluation": "There is limited evidence in humans for the carcinogenicity of perineal use of talc-based body powder." By definition "Limited evidence of carcinogenicity" means "a positive association has been observed between exposure to the agent and cancer for which a causal interpretation is considered by the Working Group to be credible, but chance, bias or confounding could not be ruled out with reasonable confidence." IARC concluded with this "Overall evaluation:" "Perineal use of talcbased body powder is possibly carcinogenic to humans (Group 2B)."

66.     In 2006, the Canadian government under The Hazardous Products Act and associated Controlled Products Regulations classified talc as a "D2A," "very toxic," "cancer causing" substance under its Workplace Hazardous Materials Information System (WHMIS). Asbestos is also classified as "D2A".

67.     As of today, both the National Cancer Institute and American Cancer Society list genital talc use as a "risk factor" for ovarian cancer. Additionally, the Gilda Radner Familial Ovarian Cancer Registry, Roswell Park Center Institute, and the Department of Gynecologic Oncology University of Vermont publish a pamphlet entitled "Myths & Facts about ovarian

cancer: What you need to know."  This pamphlet is given to all ovarian cancer patients at nearly

every medical facility in the United States.  In this pamphlet under "known" risk factors for

ovarian cancer is "Use of Talc (Baby Powder) in the Genital Area."  Similarly, on the Sanford

Medical Center website for "patient information" regarding ovarian cancer it lists "Talcum

powder dusted on the perineum" as a risk factor for contracting ovarian cancer.

### C.    Defendants Have Been Acutely Aware of the Dangers of the Baby Powder

68.    As early as 1982, Defendants were acutely aware of the scientific evidence

linking ovarian cancer and perineal use of talcum powder.  In an August 12, 1982, New York

Times article entitled "Talcum Company Calls Study on Cancer Link Inconclusive," Defendants

admitted being aware of the 1982 Cramer study that concluded women were three times more

likely to contract ovarian cancer after daily use of talcum powder in the genital area.

69.    On November 10, 1994, the Cancer Prevention Coalition ("CPC") mailed a letter

to then J&J's CEO, Ralph Larson, informing Defendants that studies as far back as 1960's

"show[] conclusively that the frequent use of talcum powder in the genital area poses a serious

risk of ovarian cancer."  The letter cited a study by Dr. Bernard Harlow from Harvard Medical

School confirming this fact and quoted a portion of the study where Dr. Harlow and his

colleagues discouraged the use of talc in the female genital area.  The letter further stated that

14,000 women per year die from ovarian cancer and that this type of cancer is very difficult to

detect and has a low survival rate.  The letter concluded by requesting that Defendants withdraw

talc products from the market because of the alternative of cornstarch powders, or at a minimum,

place warning information on its talc-based body powders about the ovarian cancer risk they

pose.

70.     On September 17, 1997, Alfred Wehner a toxicology consultant retained by

Defendants, wrote a letter to Michael Chudkowski, manager of Pre-Clinical Toxicology at

Johnson & Johnson Consumer Products, Inc., stating that on three separate occasions the Talc

Interested Party Task Force (TIPTF) of the Cosmetic, Toiletry, and Fragrance Association

(CTFA) which included Defendants and Luzenac (Defendants' supplier of talc), had released

false information to the public about the safety of talc.  Specifically addressing a November 17,

1994, statement released by the CTFA, Dr. Wehner said the following:

> The response statement dated November 17, 1994, is just as bad.
> The second sentence in the third paragraph reads: "The workshop
> concluded that, although some of these studies suggested a weak
> association might exist, when taken together the results of the
> studies are insufficient to demonstrate any real association."  This
> statement is also inaccurate, to phrase it euphemistically.  At that
> time there had been about 9 studies (more by now) published in the
> open literature that did show a statistically significant association
> between hygienic talc use and ovarian cancer.  Anybody who
> denies this risks that the talc industry will be perceived by the
> public like it perceives the cigarette industry: denying the obvious
> in the face of all evidence to the contrary.
>
> The workshop did not conclude that "the results of the studies are
> insufficient to demonstrate any real association."  As pointed out
> above, a "real" statistically significant association has been
> undeniably established independently by several investigators,
> which without doubt will be readily attested to by a number of
> reputable scientists/clinicians, including Bernard Harlow, Debra
> Novotny, Candace Sue Kasper Debra Heller, and others.

71.     In 2006, Imerys began placing an ovarian cancer warning on its Material Safety

Data Sheets (MSDS) it provides to Defendants.  These MSDSs not only provided the warning

information about the IARC classification but also included warning information regarding

"States Rights to Know" and warning information about the Canadian Government's "D2A"

classification of talc as well.  Although Defendants admittedly received these MSDSs, they never

passed this warning information on to the consumers.  On September 26, 2012, the corporate

representative of Imerys testified in open court that his company exclusively supplied Defendants with talc used for its Baby Powder product and that ovarian cancer is a potential hazard associated with a women's perineal use of talc-based body powders, like Defendants' Baby Powder.

72. On October 19, 2012, Defendants' former in-house toxicologist and current consulting toxicologist, Dr. John Hopkins, testified on Defendants' behalf that Defendants "[are] and were aware of . . . all publications related to talc use and ovarian cancer."

73. On October 4, 2013, a jury in South Dakota Federal Court, in the case styled *Deane Berg v. Johnson & Johnson Consumer Companies, Inc.,* unanimously found that Johnson & Johnson Consumer Companies, Inc. caused the plaintiff's ovarian cancer and was negligent in failing to warn about cancer hazards on its talc-based body powders, specifically, Baby Powder and Shower to Shower.

**Defendants Failed to Warn Consumers About the Risks of
Using Johnson's® Baby Powder**

74. Despite the overwhelming scientific and medical evidence regarding talc use and ovarian cancer that has developed over the past several decades, the only warnings on the Baby Powder label are to "Keep powder away from child's face to avoid inhalation, which can cause breathing problems," and to "[a]void contact with eyes." The label also states: "SAFETY TIP: Keep out of reach of children. Do not use if quality seal is broken." Defendants provide similar warnings on their website: "For external use only. Keep out of reach of children. Close tightly after use. Do not use on broken skin. Avoid contact with eyes. Keep powder away from child's face to avoid inhalation, which can cause breathing problems."

75. None of Defendants' warnings on the product label or in other marketing informed Plaintiff and Class members that use of the product in the genital area, as was

encouraged by Defendants, could lead to an increased risk of ovarian cancer. Instead, Defendants continue to represent on the labeling and other marketing that Johnson's® Baby Powder is "clinically proven mildness," "clinically proven to be safe, gentle and mild," and "that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer-reviewed studies."

76.     Johnson's® Baby Powder is advertised for use by women and does not instruct that the product may lead to an increased risk for ovarian cancer when used in the genital area, but instead that the product is clinically proven safe and mild.

77.     That Johnson's® Baby Powder was safe for use by women when, in fact, it is not, is a material fact. Defendants understood that consumers, including Plaintiff, would attach importance to the existence and truth of the representations made in deciding whether to purchase its products and would consider such objective statements of fact material.

78.     Despite Defendants' knowledge, Defendants failed to inform Plaintiff and the Class of material facts and misrepresented material facts in connection with the sale of Johnson's® Baby Powder with intent that others rely upon the concealment, suppression, omission, or misrepresentation of such material facts.

79.     Defendants' omissions and representations constitute deception, fraud, false pretense, false promise, misrepresentation, omission, concealment and suppression of material information and a failure to inform Plaintiff and the Class of a material fact in connection with the sale of merchandise.

80.     Plaintiff and the Class members purchased Johnson's® Baby Powder primarily for personal, family or household purposes.

81.     As a result of Defendants' above-described representations and omissions,

Plaintiff and the Class members have suffered an ascertainable loss of money by purchasing a

dangerous product advertised as a safe product.  Plaintiff has suffered injury in fact and a loss of

money in that she has been deprived of the benefit of her bargain and has spent money on

Johnson's® Baby Powder when it contained serious risks, which were known to Defendants but

undisclosed, concealed, and misrepresented by Defendants.

82.     Defendants, by contrast, reaped and continue to reap enormous profits from their

deceptive marketing and sale of Johnson's® Baby Powder.

## CLASS DEFINITION AND ALLEGATIONS

83.     Plaintiff brings Count I of this action for injunctive relief under the Illinois

Consumer Fraud and Deceptive Business Practices Act ("ICFA"), pursuant to Federal Rule of

Civil Procedure 23(a) and  (b)(2), on her own behalf and on behalf of a Class (the "ICFA

Class"), defined as:

> All Illinois consumers who, within the three years preceding the
> filing of this Complaint, purchased Johnson's® Baby Powder in
> the State of Illinois.

84.     Plaintiff brings Count II of this action for unjust enrichment pursuant to Federal

Rule of Civil Procedure 23(a), (b)(2), and (b)(3) on her own behalf and on behalf of a Class (the

"UE Class"), defined as:

> All Illinois consumers who, within the five years preceding the
> filing of this Complaint, purchased Johnson's® Baby Powder in
> the State of Illinois.[2]

85.     Plaintiff is a member of the Classes she seeks to represent.

---

[2] Unless otherwise noted, the ICFA Class and UE Class are collectively referred to as the "Class"
or "Classes."

86. Excluded from the Classes are Defendants, their parents, subsidiaries, affiliates, officers and directors, those who purchased Johnson's® Baby Powder for the purpose of resale, and those who assert claims for personal injury.

87. Members of the Classes are so numerous and geographically dispersed that joinder of all Class members is impracticable. Plaintiff is informed and believes, and on that basis alleges, that the proposed Classes contain many thousands of members. The precise number of Class members is unknown to Plaintiff.

88. Common questions of law and fact exist as to all members of the Classes and predominate over questions affecting individual UE Class members. The common legal and factual questions include, but are not limited to, the following:

    i.    Whether Defendants knew or should have known that use of talcum powder can lead to an increased risk of ovarian cancer;

    ii.    Whether Defendants' affirmative representations and/or failure to disclose that use of talcum powder can lead to an increased risk of ovarian cancer constitutes the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, in the conduct of any trade or commerce;

    iii.    Whether Defendants' conduct constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.;*

iv.     Whether injunctive, declaratory, and/or or other equitable relief is warranted pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act;

v.      Whether Plaintiff and the ICFA Class members are entitled to an award of punitive damages as permitted by the Illinois Consumer Fraud and Deceptive Business Practices Act;

vi.     Whether Defendants have been unjustly enriched by its retention of profits from the sale of Johnsons® Baby Powder which it deceptively advertised, marketed, and sold;

vii.    Whether Plaintiff and the UE Class members have sustained monetary loss and the proper measure of that loss; and

viii.   Whether Plaintiff and the UE Class members are entitled to an award of compensatory damages.

89.     The claims asserted by Plaintiff in this action are typical of the claims of the members of the Classes, as the claims arise from the same course of conduct by Defendants, and the relief sought is common. Plaintiff and Class members suffered uniform damages caused by their purchase of Johnson's® Baby Powder manufactured, marketed, and sold by Defendants.

90.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Classes. Plaintiff has retained counsel competent and experienced in both consumer protection and class litigation.

91.     Defendants have acted or refused to act on grounds generally applicable to the ICFA Class thereby making final declaratory and/or injunctive relief with respect to the members of the ICFA Class as a whole appropriate.

92. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable or impossible for proposed UE Class members to prosecute their claims individually. It would thus be virtually impossible for the UE Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if UE Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

## COUNT I
## Violation of the Illinois Consumer Fraud and Deceptive Business Practice Act

93. Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

94. Plaintiff seeks injunctive relief on behalf of the ICFA Class pursuant to Federal Rule of Civil Procedure 23(b)(2).

95. Johnsons® Baby Powder is "merchandise" pursuant to 815 ILCS § 505/1(b).

96. The advertising, offering for sale, sale, and/or distribution of Johnsons® Baby Powder constitutes "trade" or "commerce" pursuant to 815 ILCS § 505/1(f).

97. Plaintiff is a consumer pursuant to 815 ILCS § 505/1(e) because she purchased Johnsons® Baby Powder for her personal use or that of a member of her household.

98.     Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, prohibits unfair methods of competition and unfair or deceptive acts or practices, including, but not limited to, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce . . . whether any person has in fact been mislead, deceived or damaged thereby."

99.     As set forth above, Defendants engaged in, *inter alia*, the following practices in transactions with Plaintiff and the ICFA Class in Illinois which were intended to result in, and did result in, the sale of the Johnson's® Baby Powder products:

       i.     Representing that the products have approval, characteristics, uses and benefits which they do not have.

     ii.     Representing that the products are of a particular standard, quality or grade when, in fact, they are of another.

   iii.     Advertising goods with intent not to sell them as advertised.

   iv.     Representing that the products have been supplied in accordance with a previous representation when they have not.

100.    Defendants concealed, suppressed, and/or omitted material facts on the Johnson's® Baby Powder product labels and packages as described above when they knew, or should have known, that use of Johnson's® Baby Powder by women was not safe and could cause a significant increased risk of ovarian cancer.

101.    Defendants further misrepresented material facts on the Johnson's® Baby Powder product labels and packages as described above by affirmatively stating that Johnson's® Baby Powder is clinically proven to be safe, gentle and mild.

102.    Defendants' omissions and representations constitute deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of material facts in connection with the sale of merchandise in Illinois.

103.    The acts and practices engaged in by Defendants, as set forth herein, constitute unfair, deceptive and/or fraudulent business practices in violation of 815 ILCS § 505/1 *et seq.*

104.    The aforesaid unfair and deceptive acts and practices occurred in the course of conduct involving trade or commerce.

105.    Defendants intended that Plaintiff and the ICFA Class rely on the aforesaid deceptive advertising, acts and practices.

106.    As a direct and proximate result of the aforesaid violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, Plaintiff and the ICFA Class have suffered an ascertainable loss of money and/or property.

107.    Defendants continue to market, advertise, and sell Johnsons® Baby Powder without disclosure of its serious health risks, and, in fact, continue to misrepresent that the Baby Powder is safe, gentle and mild.

108.    815 ILCS § 505/10 permits the Court to enter injunctive relief to prevent Defendants' continued violation of the law by continuing to market, advertise, and sell Johnson's® Baby Powder with misrepresentations and omissions of material facts.

109.     Defendants' conduct as aforesaid was and continues to be wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff and others similarly situated and, therefore, warrants the imposition of punitive damages.

110.     Plaintiff has been forced to hire attorneys to enforce her rights under the Illinois Consumer Fraud and Deceptive Business Practices Act.

## COUNT II
## Unjust Enrichment

111.     Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

112.     Plaintiff seeks relief on behalf of the UE Class pursuant to Federal Rule of Civil Procedure 23(b)(3).

113.     Plaintiff and the UE Class members conferred a monetary benefit on Defendants when they paid for Johnsons® Baby Powder.

114.     As set forth above, Defendants knowingly misrepresented and concealed material facts in connection with their marketing, advertising, and sales of Johnsons® Baby Powder.

115.     Defendants have retained Plaintiff's and the UE Class members' purchase price despite their failure to adequately disclose the known safety risks of the Baby Powder.

116.     As a result, Defendants are unjustly enriched at the expense of Plaintiff and the UE Class.

117.     Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and the UE Class that Defendants gained through deceptive and fraudulent material misrepresentations and omissions in the marketing, advertising, and selling of Johnsons® Baby Powder.

118.     As a direct and proximate result of Defendants' conduct, Plaintiff and the UE Class members overpaid for the Johnsons® Baby Powder because they paid a price that was based on Defendants' material misrepresentations and concealments regarding the safety of the Baby Powder.

119.     Accordingly, Plaintiff and the UE Class seek full disgorgement and restitution of the amounts Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein, an amount which will be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Classes, seeks the following relief:

A.     certification of the ICFA Class pursuant to Federal Rule of Civil Procedure 23(b)(2);

B.     certification of the UE Class pursuant to Federal Rule of Civil Procedure 23(b)(3);

C.     awarding Plaintiff and the ICFA Class injunctive relief as permitted by law or equity, including enjoining Defendants from continuing the unlawful practices as set forth herein, ordering Defendants to engage in a corrective advertising campaign, and directing Defendants to identify, with court supervision, victims of their conduct;

D.     awarding punitive damages for the ICFA Class under the Illinois Consumer Fraud and Deceptive Business Practices Act in an amount to punish Defendants' egregious conduct as set forth above and to deter Defendants and others from engaging in similar conduct;

E.     awarding Plaintiff and the proposed UE Class members damages;

F.      awarding attorneys' fees and costs; and

G.      providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues stated herein, and all issues so triable.

Respectfully submitted,

**GOLDENBERG HELLER ANTOGNOLI & ROWLAND, P.C**


By:  /s/ Kevin P. Green
Mark C. Goldenberg #00990221
Thomas P. Rosenfeld #06301406
Kevin P. Green #6299905
2227 South State Route 157
Edwardsville, IL 62025
618-656-5150
mark@ghalaw.com
tom@ghalaw.com
kevin@ghalaw.com